Thank you and good morning. May it please the Court, Sarah Weinman on behalf of Mr. Nava-Maytorel. The evidence against Mr. Nava, as well as his statements, should have been suppressed, and I ask this panel to reverse the District Court's denial of Mr. Nava's suppression motions. First, because there was no reasonable suspicion, as the District Court found at ER 361, the set forth by the record evidence, the lane change that prompted the seizure doesn't provide reasonable suspicion, and the inferences of allegedly suspicious activity flowing from that lane change were unreasonable and inadequately articulated. Why would you say, maybe you're right that the lane change by itself wouldn't have been enough, but obviously there were other things that kind of added together, cast some suspicion on your client, why wouldn't that together, all of those things together be enough? For several reasons, Your Honor. First of all, the reasons given by the agents in the incident reports didn't articulate any of those factors that later came out, the nervousness, the stretching, the passenger-mouthing words for the Spanish expression, no mama's way, the flashing documents, absolutely none of that was in any of the agents' incident reports, which were written hours after the arrest, and as the District Court found that... So you want us to conclude that none of those observations were actually truthful, is that what you're saying? No, not necessarily. They weren't articulated at the time because, according to the agents, they forgot, they apparently subsequently remembered a couple of months later at the hearing, and... So you want us to infer that they just made all of those details up? Not necessarily, but I do think that... But so what's the point of... All I'm asking is, I mean, we have findings from the District Court here that certain things did happen. I don't think you're going to persuade us to just disregard those. So let's hear your argument as to why, considered collectively, that wasn't enough to at least arouse suspicion in the officers that, hey, maybe we need to investigate this guy, he's acting kind of bizarrely. Well, as the District Court itself found, there was some suspicion here. The question is, was that suspicion reasonable? And as the District Court found, it wasn't. We have, first of all, the expression, no mamis way. So the agent testified that he saw the passenger, he lip-read the passenger make that expression. He testified that he was viewing the passenger in profile from a distance of about eight feet with closed windows as the passenger had his hands to his face. So even presuming that that lip-reading was reliable, the agent testified that the expression can mean many different things from quit kidding around to oh shit, depending on the context. And the agent also testified that he didn't know the context in which that statement was made. So we just have no way of knowing... It's unreasonable to conclude, as the agent did, that the expression was a response to seeing the Border Patrol vehicle in front of them, particularly since the evidence suggests that Mr. Nava exited the freeway directly behind the Border Patrol vehicle. So that wouldn't have been the first time they saw it. There was also the stretching, which the agent said was suspicious. But as the District Court found, an extra hard stretch with hands clenched overhead, as it was described, shouldn't be afforded any great weight, particularly since, as the agent testified, the rest area was the first exit after, quote, a long stretch of freeway. So presumably, they'd been sitting in the car for quite some time. Then there was the nervousness. Well, wasn't there the showing of the papers, kind of conspicuously in front of the... Right, the flashing documents. So, you know, as the District Court noted, even if that was a little bit overboard, it's still consistent with the totality of the circumstances here, which you have a young man who's wanting to make sure that the agents know that he's fully present in the U.S., especially considering that he's pulled up and parked next to Border Patrol with Mexican plates. So together, under the totality of the circumstances, again, that doesn't amount to reasonable suspicion. And as for the nervousness, the District Court found, and this Court has found as well, that that's to be expected under the circumstances. So in sum, again, as, you know, the District Court noted that... Ms. Weinman? Pardon? Ms. Weinman? Yes. It seems to me you've left out two other circumstances. One is they confirmed that the car had just come from just across the border. And secondly, that this rest stop was notorious as a way station for smuggling. How about when you add those two factors into the equation? The proximity to the border, as we know from Brignone-Ponce and Sigmund Ballesteros, shouldn't weigh much in the totality of the circumstances. And in fact, I would suggest that that cuts both ways. Obviously, Mr. Nava's car had cleared customs at the border, which would really cut against reasonable suspicion. And as far as... Pardon me, your second question? The rest stop was a place known to be... So that's something that appears in several places in the government's briefs, that the rest stop actually mischaracterizes the agent's testimony here. At ER 68, the agent said that in his experience, smugglers do one of four things in this area. And this agent had been at the San Clemente checkpoint for something like six or eight years or longer. So they'll either exit at the Las Pulgas Road and turn around southbound on I-5. They'll pull over to the shoulder and wait for the checkpoint to become non-operational. They'll feign car trouble or they will, quote, pull into the rest area until the checkpoint is non-operational. So given the agent's testimony, what we'd expect to see here is lag or delay or loitering on Mr. Nava's part. But that's not what we have. In fact, Mr. Nava's actions just don't fit the agent's experience of the smuggler profile. He pulled into the rest area. He went to Border Patrol. He got out. He stretched. He used the bathroom. He returned in short order. And he went straight back for the driver's side door as if to leave. At that point, he was intercepted. So again, under the totality of the circumstances, we just don't have, what suspicion we have just isn't reasonable. That's what the district court found. And that's what we would urge this court to find as well. You said the district court found that there was no reasonable suspicion? I thought it was just the opposite. No, the district court found at ER-361 that there was no reasonable suspicion. Okay. And the district court stated that at the time the request for consent occurs, that's not reasonable suspicion at ER-361. Okay. So that's a legal conclusion in any event, isn't it? It is. And this court is reviewing de novo. But I would suggest that this court should Okay. And so what about the consent issue? So regarding the consent, the government has a heavy burden to show that consent was voluntary. They haven't met that burden here. No reasonable person would have felt free to terminate this encounter under these circumstances where the agents retained Mr. Nava's identity documents. He wasn't told that he had a right to refuse consent. He wasn't Mirandized. The agent's were visible. There's testimony that one of the agents touched the handle of his weapon during the encounter. The only neutral factor here is that the agents didn't tell Mr. Nava that they could obtain a search warrant. So the heavy balance of factors weighs against voluntariness and the government simply hasn't met its burden to show otherwise. Moving on to the Miranda issue, here too the government's burden is to show that the Miranda advisal was adequate. And they haven't done that here. The Miranda advisal was just a mess. We have four different translations of the advisal submitted, three of them submitted by the government, each slightly different with some material differences. We have questions from Mr. Nava regarding whether it was necessary to have an attorney here. And the agent's totally equivocal. No, well, like, whatever. Yes, it's your right, but no, it's not necessary. So in effect the advisal was ambiguous. It was equivocal and it just didn't provide the type of meaningful advice to the unlettered and the unlearned that San Juan Cruz requires. If I could reserve my remaining time. Of course. Thank you. Thank you very much. We'll hear from the government now. Good morning. May it please the court. Michael Heyman on behalf of the United States. Your Honor, there are at least 11 separate reasons the reasonable suspicion existed. The defense counsel talked about a few to begin. I want to ask this question before I forget on the same subject. You agree with Ms. Weinman's statement that the district court found that there was no reasonable suspicion? Your Honor, I don't. I respectfully disagree with that. If we look at E.R. at 361, that statement comes in the middle of a long colloquy by the judge regarding the suspicion that existed here. If we go just a paragraph down, the court actually said that reasonable suspicion didn't exist based on the abrupt lane change. And so if we go even before that statement, there's a discussion regarding the highly suspicious, and I quote the district court judge in saying that the agent determined that it was highly suspicious that there was this exaggerated stretching. On two occasions in the record, the district judge commented about the very significance of this corridor and how, in fact, in the district judge's mind, location matters in this case. So there were a number of reasons why that particular statement should not be So with respect to the other issues that were not mentioned, as far as reasonable suspicion goes, we also need to remember what happened not just after the exaggerated stretching, but there were a couple of minutes where the agents approached the defendant and had a conversation with him. And there are at least four reasons that reasonable suspicion arose just in that one or two minutes of conversation, is the agents asked the defendant for his identification, and even though he had just displayed it to the agent a couple of minutes before that, he then couldn't find it. Once he finds an identification, he pulls it out, and it turns out to be that of his co-passenger, who then he characterizes as being dumb, and that's the reason he couldn't hold it. The defendant is also nervous at this point and adds yet another statement, which is that he'd been partying all night. So there were a number of things that happened just in that one or two minutes that are very significant also to the reasonable suspicion analysis. Turning to the consent issue, I think the key here is to look at the two factors that I think are of most significance, which are the custody and guns, as far as the five factors are concerned. Well, I would say custody is probably the number one factor from our cases, but also the fact that the agents didn't tell the defendant that he did not have to consent, that those two things together seem to be, feature pretty significantly in this case. I do agree, Your Honor, but I would point out that with respect to certain cases that were cited in the government's brief as far as Ninth Circuit authority, which is whether it's required to notice the individual that they need to provide consent, to Mirandize, there's a little bit of conflicting case law, and in fact, in some circumstances, it is better to not indicate that, for instance, you need a search warrant. Well, that's not what I'm talking about. I'm talking about telling the person, we'd like your consent, but you, of course, have the right to refuse. That's totally different from saying, if you refuse, we're going to get a search warrant, which had the officer said that here, they would have lied, because they didn't have probable cause at that point. Your Honor, I would concede that none of the agents said that, and that weighs against the government as far as that particular factor goes. But I would then point to the other issues that exist here, which are the custodial, whether the defendant was in custody. Which he was under our cases, because the agents didn't return his documents. And you'd have to concede that he wasn't going to leave without them. He wasn't permitted to, right? Your Honor, what I would concede is that he was seized for purposes of a fourth and an analysis. I would not concede that he was in custody for purposes of consent. So how do you distinguish Washington, then? Because there we said that the defendant was seized, was in custody, and he clearly was not placed under arrest at that point. It was very similar, I think, to the circumstances here. I would look at the totality of circumstances. I'm talking about the custody. You tried to say that he was not in custody, and I think that's flatly refuted by our cases. So tell me why on that point, not the totality, on that point, Washington is distinguishable. No handcuffs, no guns drawn. In fact, Washington was handcuffed? I don't think so. The guns were drawn? I don't think so. So how is it distinguishable? Your Honor, I unfortunately don't remember all the specific facts. Let me just tell you, it's really not distinguishable on that point. So let's hear your argument as to why under the totality you think it's distinguishable. Okay. I'll help you. It was late at night there. This was in broad daylight. There were other people around here there. He was all alone. That's, I assume, what you're going to argue? What I can fall back on, Your Honor, since I don't remember the specific facts of Washington, are the factors that the Ninth Circuit has articulated as far as what it takes to be in custody. And those are, yes, broad daylight, whether the guns were displayed, the number of officers, and there was a bit of a ---- I think you're getting things jumbled together. Let me ask you this. Do you have a case for us in which someone was in custody, was not told that they had the right to refuse consent, and be nonetheless held that consent was voluntary? Can you cite a case in which that was true? Your Honor, can you repeat those factors? Yes. Okay. So I'm going to focus on the fact that the defendant was in custody. Let's assume that here we were to conclude that the defendant was in custody. The agents did not tell the person they had the right to refuse consent, and our court nonetheless held that consent was voluntarily given. I haven't been able to find a case that fits that pattern, and I'm hoping that you'll enlighten us if you have one. I think, Your Honor, U.S. v. Osborne, if I can take just a second here, which was a case that followed Chan that defendants cited. If memory serves, it was a case where the court was attempting to distinguish Chan for custody purposes, excuse me, for consent purposes, to determine whether consent was voluntarily given, and they determined that without the menacing show of force that existed in Chan, that there was no custodial setting. Okay. I'll have to take a look at it. I don't remember Osborne. That's your best case, I think, on this point you're saying? Yes, Your Honor, as far as I can recall. Okay. I'll certainly take a look at that. And if Your Honor would like, I can give you the citation to that. That'd be great. That's 203 F. 3rd, 1176, 9th Circuit, 2000. Great. Thanks. And then with respect to the guns issue, Your Honor, there was some conversation in both of the briefs as far as whether guns were drawn. And I do want to point out that the district court sort of by negative implication absolutely found that there were no guns drawn, much less even touched during this encounter. In fact, the district court went on at great length to say how casual the encounter was and how relaxed the defendant was, even as shown by the fact that the defendant then went and put up his feet on the park bench afterward. Turning to the Miranda issue, I'd like to point out first that on the waiver issue, it's not just that whether there was a new argument raised here or whether there was a new claim raised here. The point here is that even at the district court level, the court made it an explicit finding that the free issue, whether an attorney was free or not, was not even an issue before the district court. And all of the evidence that was procured, that was never even issued. We didn't have expert testimony on the difference between the term, the name, excuse me, the word nombrar, whether it means named or appointed. And the defense counsel's own expert that testified agreed with two of the other translations that the term nombrar meant appointed. So as far as the district court was concerned, this wasn't an issue at all at the lower level, and that's why the government raised the issue of waiver at this level. So unless Your Honor has any additional questions. Just one question. If we were to affirm the defendant's conviction, do you concede that we would nonetheless need to remand for resentencing? On the minor role issue? Well, I think, yeah. Your Honor, I don't think so, because at the very beginning of the sentencing colloquy, Judge Burns flat out said, I understand that this is an issue. I'm taking these factors into consideration. And while he didn't tick off the various factors, I'm not aware of Ninth Circuit authority that says he's required to specifically tick off those factors when he did say he's going to consider it. So we should assume that that was part of the consideration. Okay. Thank you. Thanks very much. What about the fact that the guideline has been amended? Is Your Honor asking with respect to the methamphetamine, the lowering of the sentencing? The minor role guideline? I'm a little bit confused as far as, I mean, the court did take into consideration the applicability of those guidelines. But the minus two that the sentencing commission took off, I think, was taken into account in the guidelines calculations. I didn't understand what you just said. The district judge denied a minor role, is that right? That's correct. Okay. Now, after that happened, the sentencing commission amended the minor role guideline, right? Yes. Okay. Following up on Judge Watford's question, why shouldn't we remand the case to the district judge to reconsider whether he qualifies for the minor role in light of the amendment? Because the district court took into fact the prospective changes in the guidelines that were going to be coming. The district court up front said, I recognize that they're not law yet, but I'm nonetheless going to take them into consideration in my analysis. So that was all accounted for. Thank you. Okay. Let's give you a minute for rebuttal. Just a couple of quick points, Your Honor. First of all, at ER 361, the district court explicitly said, at the point the request for consent occurs, they have no reasonable cause. In other words, the district court found no reasonable suspicion here. And, again, we would urge the court to do the same. What suspicion there was was simply unreasonable. On the consent point, as Your Honor pointed out, we have – Wait a minute. Reasonable cause is not the same as reasonable suspicion, is it? And then in the following, he uses the phrase reasonable cause and then goes on to say that there's no reasonable suspicion in the following paragraph. Again, that's at ER 361. As to the consent issue, again, we have clearly three factors here weighing against voluntariness. I would submit we have a fourth under Washington, even whether or not firearms are drawn, the display of firearms is enough to at least weigh toward involuntariness. And we have more than that here. We have testimony that there was an officer touching the handle of the gun, which under this court's decision in Oruraji v. INS weighs against voluntariness. So there was no consent here. On the Miranda issue, the government's contention apparently is that if only the right to counsel was discussed below, then that's insufficient to preserve the claim. The district court plainly said that – and correctly surmised that trial counsel, quote, said we're claiming that the recital of his rights was sufficiently unclear so as to invoke a responsibility on the part of the officers to clarify what the rights were. That's at ER 365. The claim was preserved. Our arguments on appeal granted are slightly different insofar as they go to one of the trio of components of right to counsel, and that's the right to appointed counsel. But beyond that, the claim is preserved. The government's own translations, one of which translated the word Nombrara as being designated instead of appointed, that was approved by the government's head translator before it was filed with the court. It just shows that this advisal was messy, it was inadequate, it was unclear, and that's insufficient. Let me ask a question. Do you agree that at sentencing, Judge Burns took into consideration the prospective guideline amendment on my rule? No. The court said at 418, I'm familiar with the proposed change in the law. I'm not going to give that effect. He did say that he would consider some of the factors. He didn't consider all of the factors, as this court in Quintero Leyva requires. He also specifically said that the fact that Mr. Nava, quote, did the essential thing was dispositive in the role analysis, and we know from the new rule guidelines that that's improper. So we would also ask that this case be remanded for resentencing. Okay. Thank you, Your Honors. All right. Thank you. Thanks very much. The case just argued will be submitted.
judges: Tashima, Silverman, Watford